IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OS SHIPPING CO. LTD. and ASSURANCEFORENIGEN SKULD (GJENSIDIG) as subrogee of OS Shipping Co. Ltd., | 11-CV-377-BR |
| Plaintiffs, | OPINION AND ORDER |
| v. | |
| GLOBAL MARITIME TRUST(S) PRIVATE LIMITED, JS LINE SA, and HONG JAE HYUNG a/k/a Jay H. Hong, | |
| Defendants. | |

**GEORGE M. CHALOS**
Chalos & Co., P.C.
123 South Street, Suite 105
Oyster Bay, NY 11771
(516) 714-4300

**ROBERT I. SANDERS**
**TODD A. ZILBERT**
Wood Tatum
6915 S.W. Macadam, Suite 115
Portland, OR 97219
(503) 224-5430

        Attorneys for Plaintiffs

1 - OPINION AND ORDER

**C. KENT ROBERTS**
**CATHERINE B. BRINKMAN**
**NOAH JARRETT**
Schwabe Williamson & Wyatt, PC
1600-1900 Pacwest Center
1211 S.W. Fifth Avenue
Portland, OR 97204
(503) 796-2888

**OWEN F. DUFFY, III**
Law Office of Owen F. Duffy
5 Penn Plaza
19th Floor
New York, NY 10001
(516) 721-8793

            Attorneys for Defendant JS LINE SA


**BROWN, Judge.**

        This matter comes before the Court on the Motion (#21) of
Defendant JS Line SA (JSL) to Dismiss Verified Complaint and
Vacate Maritime Attachment and Plaintiffs' Motion (#66) to Strike
JSL's Supplemental Declaration of Owen F. Duffy.  For the reasons
that follow, the Court **DENIES** JSL's Motion to Vacate and **DENIES**
Plaintiffs' request for costs and attorneys' fees incurred to
respond to JSL's Motion.  The Court also **GRANTS in part** and
**DENIES in part** Plaintiffs' Motion to Strike as specified herein.


                        <u>BACKGROUND</u>

        On March 28, 2011, Plaintiff OS Shipping (OSS), a South
Korean business, filed its Verified Complaint in Admiralty that

2 - OPINION AND ORDER

includes an Application for Attachment under Supplemental
Admiralty Rule B.  OSS sought to attach the M/V GMT Venus while
it was present in the District of Oregon as security for OSS's
rights to recover under a certain Declaratory Award issued by a
London Arbitration Tribunal.[1]  OSS asserted JSL, a Panamanian
business that owns the Venus, is the alter ego of GMT; JSL,
therefore, is liable for the debts of GMT; and, accordingly,
JSL's asset, the Venus, is subject to attachment in Oregon.

Based on the *ex parte* application of OSS, the Honorable Garr
M. King ordered and the Clerk issued a Writ of Attachment for the
Venus on March 28, 2011.  On March 31, 2011, JSL filed its Motion
to Dismiss Verified Complaint and Vacate Maritime Attachment.  In
support of the Motion, JSL offered the Declarations of H.S. Oh,
Lee Jin Tai (Lee), Yang Woo Mun (Yang), Hong Jae Hyung (Hong),
and Yoon Ji Yi (Yoon) to support its assertion that there is not
any basis to conclude that JSL is GMT's alter ego, and,
therefore, there is not any basis for the Venus to be held in the
District of Oregon.

On April 6, 2011, the Court initially heard argument on
JSL's Motion, and the Court granted OSS's request for leave to
file an amended complaint to set out with more specific detail
the facts supporting OSS's alter-ego allegations against JSL.

_____

[1] The Declaratory Award arises from OSS's claim for breach
of maritime contract by Defendant Global Maritime Trust (GMT), a
Singapore business.

3 - OPINION AND ORDER

Accordingly, the Court denied as moot that part of JSL's Motion in which it sought dismissal of the original Complaint for failure to state a claim.

The Court also deferred resolution of JSL's Motion to Vacate and granted OSS's request for expedited jurisdictional discovery as to the facts relating to OSS's alter-ego claim.  The Court advised it would reconvene the hearing on JSL's Motion to Vacate following this limited discovery to determine whether there is sufficient evidence to uphold the attachment of JSL's vessel as security for an obligation that GMT purportedly owes OSS, which is the sole basis for jurisdiction in Oregon.

After OSS deposed JSL's witnesses Hong, Yoon, and Lee in Seoul, Korea, OSS filed its Amended Complaint (#57) on April 19, 2011.  In the Amended Complaint, OSS added Plaintiff Assuranceforenigen Skuld (Gjensidig) "on its own behalf and as subrogee of its Member OSS, and others."  OSS also added "Hong Jae Hyung a/k/a Jay H. Hong" as a defendant and asserts he is personally liable for the Declaratory Award in Plaintiffs' favor.

In their Amended Complaint, Plaintiffs provide twelve additional pages of factual allegations to support their alter-ego claim against both JSL and Hong.  Am. Compl. ¶¶ 38-136.  In support of their contention that the Writ of Attachment should not be vacated, Plaintiffs filed a Supplemental Memorandum (#59) and roughly 400 pages of Exhibits (#58) with the Declaration of

4 - OPINION AND ORDER

George M. Chalos.  In turn, JSL filed its responsive brief and roughly 300 pages of exhibits on April 22, 2011.

The Court heard continued argument on JSL's Motion to Vacate Maritime Attachment on April 25, 2011, and took the Motion under advisement at the conclusion of the hearing.[2]

## PLAINTIFFS' MOTION (#66) TO STRIKE

On April 27, 2011, without leave of court or conferral with Plaintiffs, JSL filed the Supplemental Declaration (#63) of Owen F. Duffy with multiple attachments to supplement the record as to the Motion to Vacate, which, as noted, the Court had already taken under advisement.  On April 29, 2011, Plaintiffs filed their Motion (#66) to Strike the Supplemental Declaration.

Plaintiffs request the Court to strike JSL's Supplemental Declaration on the grounds that JSL's submission violates Local Rule 7.1 for lack of conferral, was submitted without leave of Court after the Motion to Vacate was taken under advisement, and contains materials that are beyond the scope of the Motion to Vacate.  Plaintiffs also seek the imposition of sanctions against JSL's counsel, including attorneys' fees and costs, for the time expended in responding to JSL's Supplemental Declaration.

---

[2] To date, neither GMT nor Hong have appeared in this matter.

5 - OPINION AND ORDER

I.    **Motion to Strike.**

The Court has the inherent power to manage and to control its docket, which includes the discretion to strike documents. *See Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010)("The inherent powers are mechanisms for 'control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'")(citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991)). The Ninth Circuit elaborated on the extent of a district court's authority:

> Indeed, the inherent powers permit a district court to go as far as to dismiss entire actions to rein in abusive conduct. *See Atchison*, 146 F.3d at 1074 (recognizing inherent power to dismiss an action to sanction abusive conduct such as judge-shopping or failure to prosecute). It necessarily follows that, as part of its power to "manage [its] own affairs," *Chambers*, 501 U.S. at 43, 111 S. Ct. 2123, a district court can use less drastic measures such as striking documents from the docket to address litigation conduct that does not warrant outright dismissal.

*Ready Transp.*, 627 F.3d at 404. These powers differ from the Court's authority to strike a pleading under Federal Rule of Civil Procedure 12(f), which permits a court to strike all or part of a pleading (such as a complaint, an answer, or a reply, but not a motion) under certain conditions.

JSL contends it "felt that it was a matter of urgency to present certain materials to the Court as the Plaintiffs had

6 - OPINION AND ORDER

promised to do." JSL, however, did not make any request to file supplemental materials during or following the hearing, did not confer with Plaintiffs' counsel about the issue in the two days between the conclusion of the hearing and the filing of JSL's Supplemental Declaration, and did not seek leave of Court to supplement the record after the Court had taken the Motion under advisement.

The Court notes that, at the April 6, 2011, hearing, it explicitly admonished the parties to comply with the Local Rules of Court, and, in particular, the Court noted the obligation of local counsel to ensure that compliance. Other than a response and a reply to a motion, Local Rule 7-1(e)(3) provides "no further briefing is allowed" unless by leave of Court. Notwithstanding that JSL had ample and fair opportunity to make its record in support of its Motion to Vacate before the conclusion of the hearing on April 25, 2011, JSL's counsel filed Duffy's Supplemental Declaration without leave of Court or even any notice to (not to mention conferral with) Plaintiffs' counsel. The Court finds this inexplicable tactic analogous to a party knocking on the jury-room door during deliberations to add to the record. This conduct is particularly egregious in light of the fact that it occurred after the Court's admonishment of the parties for making filings that were out of order, unauthorized, and not in accordance with the Local Rules.

Nevertheless, the Court has reviewed the content of JSL's Supplemental Declaration and finds the materials are either irrelevant or redundant and, therefore, should be stricken. Exhibits A, B, C, and E concern proceedings that are taking place in jurisdictions other than the District Court of Oregon. Although JSL contends these materials are relevant to "issues raised during the oral argument," the Court finds those documents do not relate in any way to the limited analysis of Plaintiffs' alter-ego claim, which is currently the only issue before the Court. Exhibit D is a Third Declaration of Mr. Yang Woo Mun of GMT Korea Co. Ltd. in which Yang reiterates statements already in the record and offers irrelevant commentary on the actions of Chalos, Plaintiffs' counsel.

For these reasons, the Court grants Plaintiffs' Motion to Strike the Supplemental Declaration (#63) of Owen F. Duffy. Because the Court has stricken the Supplemental Declaration, the Plaintiffs' requests in their Reply for additional documentary discovery and for an opportunity to respond to JSL's supplemental materials are moot.

## II.  Sanctions.

Plaintiffs also request the Court to sanction JSL's conduct for willful disobedience of the Local Rules and this Court's orders.  As a sanction, Plaintiffs seek an award of the attorneys' fees and costs they incurred in filing the Motion to

Strike.

The Court notes that if JSL had conferred (as required) and filed a motion for leave to supplement the record (also required), Plaintiffs would have likely spent the same amount of time in considering and responding to JSL's request.  Thus, the Court concludes Plaintiffs were not prejudiced by JSL's unauthorized and noncompliant filing, and, therefore, the Court denies Plaintiffs' request for sanctions in the form of attorneys' fees and costs.

Nevertheless, the Court remains quite concerned with the disturbing pattern of counsel's conduct to date in repeatedly ignoring conferral rules and making unauthorized supplemental or amended filings.  The Court notes the filing that prompted Plaintiffs' Motion to Strike significantly distracted the responding parties and delayed the Court in "promptly" resolving JSL's Motion to Vacate as required by Rule E(4)(f) of the Supplemental Admiralty Rules to the Federal Rules of Civil Procedure.

The Court, therefore, insists the parties abide by the federal and Local Rules and this Court's directives.  Although the Court denies Plaintiffs' request for sanctions in the form of attorneys' fees and costs at this time, any noncompliant conduct by counsel in the future is not likely to be treated as leniently.

9 - OPINION AND ORDER

**JSL's MOTION (#21) TO VACATE**

JSL moves to vacate the Writ of Attachment on the ground that Plaintiffs have not met their burden to show they are reasonably likely to prove facts sufficient to support their claim that JSL is the alter ego of GMT, and, accordingly, the Venus should not be held as security for the debt that GMT allegedly owes to Plaintiffs.  Plaintiffs, in turn, contend they have provided sufficient evidence at this stage of the proceedings to sustain the Writ of Attachment.

**I.    Standards.**

**A.    Plaintiffs' Burden.**

Pursuant to the Supplemental Admiralty Rules to the Federal Rules of Civil Procedure, the parties agree Plaintiffs bear the burden to show why the Court should not vacate the Writ of Attachment.  The Ninth Circuit has recently held a plaintiff must meet four conditions to sustain an attachment under Admiralty Rule B:

> Under Rule B of the Supplemental Admiralty
> Rules, plaintiff may attach a defendant's
> property if four conditions are met:
> (1) Plaintiff has a valid prima facie
> admiralty claim against the defendant;
> (2) defendant cannot be found within the
> district; (3) property of the defendant can
> be found within the district; and (4) there
> is no statutory or maritime law bar to the
> attachment. *Aqua Stoli Shipping Ltd. v.
> Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d

10 - OPINION AND ORDER

Cir. 2006); *see* Fed. R. Civ. P., Supp. R. B.
After receiving notice of the attachment,
defendant may contest it under Supplemental
Rule E(4)(f).  Fed. R. Civ. P., Supp. R.
E(4)(f).  At a Rule E hearing, defendant may
argue that the attachment should be vacated
because plaintiff failed to meet one of the
four conditions for attachment.  *Aqua Stoli*,
460 F.3d at 445; *see also* Fed. R. Civ. P.,
Supp. R.E. advisory committee's note (1985
amends.)(explaining that at a Rule E hearing,
defendant "can attack the complaint, the
arrest, the security demanded, or any other
alleged deficiency in the proceedings").
Plaintiff has the burden of justifying a
continued attachment. Fed. R. Civ. P., Supp.
R. E(4)(f).

*Equatorial Marine Fuel Mgmt. Servs. Pte Ltd. v. MISC Berhad*, 591
F.3d 1208, 1210 (9th Cir. 2010).  Here the parties only dispute
whether Plaintiffs have met their burden under the first
condition; that is, whether Plaintiffs have shown a valid *prima
facie* claim of alter-ego liability against JSL.

Although there does not appear to be any binding precedent
in the Ninth Circuit as to the specific nature of Plaintiffs'
burden to show that the Writ should not be vacated, the
prevailing test appears to be a "probable cause" standard that
requires Plaintiffs to demonstrate the evidence shows a fair or
reasonable probability that Plaintiffs will prevail on their
alter-ego claim.  Numerous unpublished district court decisions
support that standard.  In *Sea Prestigio, LLC v. M/Y/ Triton*,
2010 WL 5376255, No. 10CV2412-BTM AJB (S.D. Cal. Dec. 22, 2010),
the Court noted:

11 - OPINION AND ORDER

> The purpose of this hearing is not "to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant." *Lion de Mer v. M/V Loretta V*, No. L-98-921, 1998 U.S. Dist. LEXIS 10182, at *5, 1998 WL 307077 (D. Md. Apr. 3, 1998).   "At this stage in the proceedings, plaintiff merely needs to show 'probable cause' for the issuance of the warrant and writ." *Del Mar Seafoods Inc. v. Cohen*, No. C 07-02952, 2007 U.S. Dist. LEXIS 64426, at *7-8, 2007 WL 2890614 (N.D. Cal. August 16, 2007).

2010 WL 5376255, at *1.

Although the test for satisfying Plaintiffs' burden has not been specifically addressed by the Ninth Circuit, the Court concludes the "probable cause" standard is consistent with Admiralty Rule E(2)'s heightened pleading standard for *in rem* actions that requires "the complaint shall state the circum-stances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading."  Fed. R. Civ. P., Supp. R. E(2). *See also Puerto Rico Ports Auth. v. BARGE KATY-B*, 427 F.3d 93, 105 (1st Cir. 2007)("This heightened pleading standard is not some pettifogging technicality meant to trap the unwary, but, rather, a legal rule designed to counterbalance the unique and drastic remedies that are available in *in rem* admiralty proceedings.").  The Court also finds the probable-cause standard is consistent with Rule E's placement of the burden on the

12 - OPINION AND ORDER

plaintiff to show "why the writ should not be vacated" in light of the minimal showing on which the writ may be initially granted.  Fed. R. Civ. P., Supp. R. E(4)(f).

Accordingly, the Court does not make findings of fact as to the ultimate merits of Plaintiffs alter-ego claim against JSL. Instead the Court, based on the record to date, will only determine whether Plaintiffs satisfy the probable-cause standard by showing they are reasonably likely to prevail on their alter-ego claim against JSL.  *See, e.g., Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping, Ltd.*, 475 F. Supp. 2d 275, 280 (S.D.N.Y. 2006).

**B.  Alter-Ego Liability.**

Federal common law applies in admiralty cases.  The test for alter-ego liability is summarized by the Ninth Circuit as follows:

> Admiralty courts may pierce the corporate veil in order to reach the "alter egos" of a corporate defendant.  *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S A*, 339 U.S. 684, 689 n. 4, 70 S. Ct. 861, 865 n. 4, 94 L. Ed. 1206 (1950); *see also Talen's Landing, Inc. v. M/V Venture*, 656 F.2d 1157, 1160 (5th Cir. 1981).  Federal courts sitting in admiralty generally apply federal common law when examining corporate identity.  *See In re Holborn Oil Trading Ltd.*, 774 F.Supp. 840, 844 (S.D.N.Y.1991).  "Corporate separateness is respected unless doing so would work injustice upon an innocent third party."  *Kilkenny v. Arco Marine Inc.*, 800 F.2d 853, 859 (9th Cir.1986).

> We have held that disregard of corporate

13 - OPINION AND ORDER

> separateness "requires that the controlling
> corporate entity exercise total domination of
> the subservient corporation, to the extent
> that the subservient corporation manifests no
> separate corporate interests of its own."
> *Id.* (internal quotations omitted).  As
> formulated by the Second Circuit, federal
> common law allows piercing of the corporate
> veil where a corporation uses its alter ego
> to perpetrate a fraud or where it so
> dominates and disregards its alter ego's
> corporate form that the alter ego was
> actually carrying on the controlling
> corporation's business instead of its own.
> *See Kirno Hill Corp. v. Holt*, 618 F.2d 982,
> 985 (2d Cir. 1980).

*Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1294 (9th Cir.

1997).

        The Court concludes the Ninth Circuit's test in *Chan* permits

a finding of alter-ego liability either when the corporate form

is used to perpetuate a fraud *or* when one corporate entity

exhibits "total domination of the subservient entity."  123 F.3d

at 1294.  Although JSL disputes the Court's disjunctive reading

of the *Chan* test and contends Plaintiffs must prove both elements

of control and fraud, JSL has not provided any authority to

undermine the test set out in *Chan*.  Indeed, JSL's reliance on

*Doe v. Unocal Corporation* is misplaced because, as JSL conceded

at the hearing on April 25, 2011, *Doe* was based on California

state law rather than federal common law.  248 F.3d 915, 925-28

(9th Cir. 2001).  On that basis, the Court does not find any

ground to veer from the *Chan* test.

        JSL also relies on this Court's decision in *Seiko Epson*

14 - OPINION AND ORDER

*Corporation v. Print-Rite Holdings, Ltd.*, No. CV 01-500-BR, 2002
WL 32513403 (D. Or. Apr. 30, 2002).  In *Seiko* the Court reviewed
situations under federal common law in which federal courts had
pierced the corporate veil for purposes of asserting jurisdiction
over an entity that was beyond the jurisdiction of the Court on
the basis of that entity's close corporate relationship with
another entity that was within the Court's jurisdiction.  *Id.,* at
*12-*13.  The Court, however, did not state in *Seiko* any rule of
law that contradicted *Chan* and, in fact, declined to offer any
opinion "regarding the appropriate test for alter-ego liability
in this matter."  *Id.,* at *13 n.7.

## II.  Pertinent Factual Background.

The following facts are undisputed unless otherwise noted:

GMT, a time-charterer of vessels delivering bulk goods in
international shipping, was incorporated in Singapore in 2001 by
Hong.  At the time of incorporation, Hong and his wife, Yoon,
were listed as directors and shareholders of GMT.  Hong was the
President and Managing Director of GMT.  He held 99.8% of the
shares, and Yoon held .2%.

Hong also incorporated JSL.  At the time of its
incorporation in Panama in May 2008, Hong was the President and
Managing Director of JSL and held one-third of the shares in the
company.  Yoon was also a director and held one-third of the
shares.  Hong and Yoon's son, Hong Sung Won (Won), was appointed

Treasurer of JSL and held one-third of the shares.

JSL did not conduct any business until it purchased the Venus in March 2010.  In June 2010 GMT and JSL entered into an agreement under which GMT time-chartered the Venus from JSL and GMT agreed to pay $7,950 per day to JSL for use of the Venus.  On the same day, GMT time-chartered the Venus to Glovis Co. Ltd. Korea for $8,500 per day.  At all relevant times, JSL has paid a fee to a ship manager to manage the daily operations of the Venus.  Currently Doriko Limited, a Korean company, manages the Venus.

GMT had a pre-existing time-charter agreement with OSS for a vessel named MIPO BONANZA.  In August 2010 a dispute arose between GMT and OSS regarding GMT's liability for a shipment of goods bound for Libya carried by the MIPO that were allegedly damaged and/or missing.  This is the dispute that was arbitrated by an Arbitration Tribunal in London, England, in accordance with the time-charter agreement.  After considering the parties' briefs submitted in November 2010, the Tribunal issued a decision in January 2011 in favor of OSS that GMT was responsible for providing security for the cargo bound for Libya in 2010 as well as for costs and interest.

After the dispute over the cargo on the MIPO arose and while it was being arbitrated before the Tribunal, GMT and JSL each made changes in their corporate governance.  In approximately

16 - OPINION AND ORDER

December 2010 Hong resigned from his positions with JSL and allegedly transferred his shares to his son, Won.  Also, Yoon resigned her positions with GMT near the end of 2010 and allegedly transferred her shares to Hong.  Hong's mother, Lee, was appointed as a director of JSL in March 2011.

In November 2010 while the arbitration was pending, GMT and Glovis negotiated an addendum to the GMT-Glovis time-charter agreement in which GMT assigned to JSL the entire $8,500 per-day amount due from Glovis; *i.e.*, $550 per day in excess of the amount that GMT owes JSL under their time-charter agreement. Hong signed the addendum as "Hong Jae Hyung," President of JSL, and as "Jay H. Hong," Managing Director of GMT.

## III. Discussion.

As noted, JSL challenges in its Motion to Vacate whether its vessel, the Venus, may be held by this Court as security for the adverse ruling by the Tribunal against GMT by virtue of Plaintiffs' claim that JSL is GMT's alter ego.  Plaintiffs contend they have met their burden to show they are reasonably likely to prove their alter-ego claim under either or both prongs of the *Chan* test; *i.e.*, that GMT dominated and controlled JSL and that GMT has fraudulently used the corporate form of JSL to avoid GMT's obligations.  In addition, Plaintiffs contend the evidence submitted by JSL is not relaible and does not undermine Plaintiffs' showing.

17 - OPINION AND ORDER

**A.    Declarations of Lee and Yoon submitted by JSL.**

As an initial matter, Plaintiffs assert in their Supplemental Memorandum in Opposition to JSL's Motion that JSL submitted the Declarations of Lee and Yoon in bad faith.  In particular, Plaintiffs contend the deposition testimony of Lee and Yoon demonstrates that JSL's counsel knowingly submitted false Declarations by Lee and Yoon in support of their Motion. As a consequence, Plaintiffs, as clarified at the oral argument on April 25, 2011, are requesting the Court to disregard JSL's evidence in support of its Motion.

**1.    Lee Declaration and Deposition Testimony.**

In her Declaration submitted in support of JSL's Motion, Lee attests under penalty of perjury as to the details of the formation of JSL in Panama, the ownership and management of the Venus, the insurance for the Venus, the various pertinent time-charter agreements, the corporate form of and separateness between the business operations of GMT and JSL, and the impact on JSL of the arrest of the Venus.

In her deposition testimony, however, Lee stated she cannot read English, does not know where JSL was incorporated, had never previously seen the Venus ship registration (attached as Exhibit 1 to her Declaration), had not previously heard of the term "P&I" (an insurance certificate attached as Exhibit 4 to her Declaration), was unfamiliar with the term "time-charter," had

never heard of a company called "Global Maritime Trust Pte.
Ltd.," had never heard of OS Shipping, was unaware whether JSL
had a bank account, had never been to a meeting on behalf of JSL,
had never reviewed the corporate books or records for JSL, and
had not done anything on behalf of JSL.

Lee also testified with regard to the Declaration
itself that she was not asked to submit any papers to this Court
nor did she make any statements or sign any papers for the
purpose of submitting them to this Court.  Although Lee testified
she signed a document as Yoon asked her to do, Lee did not
understand its contents because it was in English and was not
translated for her.

**2.    Yoon's Declaration.**

In her Declaration submitted in support of JSL's
Motion, Yoon attests she knows Lee and considers her to be
competent, agrees with the statements set out in Lee's
Declaration, describes the time-charters between JSL and GMT and
GMT and Glovis, notes the Venus is managed by Doriko Limited, and
explains in detail her belief that the attachment of the Venus
prejudices JSL.

Although Yoon testified at her deposition that she
understood English and that she read her Declaration in English,
her deposition testimony indicates she has some difficulty
understanding English.  Yoon also testified she did not prepare

19 - OPINION AND ORDER

her Declaration, that Hong gave her the Declaration to review and
to sign, and that she did not assist in preparing responsive
documents on behalf of JSL.  Yoon also attested she does not have
any experience in the shipping industry, has not performed any
work in any capacity for GMT, and relies on help from Hong to
perform her roles as President and Managing Director of JSL.

Yoon testified Lee became a Director of JSL on March 1,
2011, and Lee gave her Declaration less than a month later.  She
testified even though Lee had little, if any, knowledge of JSL's
business, JSL's lawyer in Portland suggested Lee would be a good
witness.

### 3.   Analysis.

As noted, Plaintiffs contend JSL offered the
Declarations of Yoon and Lee with the knowledge that they were
false.  In particular, Plaintiffs note JSL's counsel informed the
Court at the hearing on April 6, 2011, that he exchanged emails
with Lee and prepared the Declaration with her via email, but
Lee's testimony reflects she did not exchange emails with
counsel.  JSL, nevertheless, maintains it did not knowingly offer
any false evidence to this Court.  JSL asserts there were a
number of factors that led to submission of the Lee Declaration
despite Lee's apparent lack of knowledge about JSL, including the
speed with which JSL had to act to have the Writ vacated, the
fact that JSL and its corporate representatives reside in

Southeast Asia, the language barrier, and the fact that Yoon was unavailable at the time.

In addition, JSL notes there were accidental, late-night telephone conversations between Chalos, counsel for OSS, and Yang, GMT Korea representative. Although the parties have filed several declarations from Yang and Chalos with conflicting details about the content of their telephone conversations that remain unresolved at this stage, it appears from Yang's Declaration (#41) that Yang saw Chalos's telephone number on correspondence between JSL's counsel and Chalos and then contacted Chalos twice in close succession in the middle of the night. Yang attests he mistakenly believed Chalos was the United States counsel for JSL. According to Yang, he expressed his concerns to Chalos about whether Lee, age 79, should give a declaration because she was not willing travel to the United States to testify. According to Yang, Chalos stated Lee could give a declaration notwithstanding her desire to avoid travel to the United States. Although Chalos asserts Yang raised other concerns about Lee's competence, age, and lack of personal knowledge, Yang disputes Chalos's characterization of the conversations. In any event, JSL contends the confusion under the tight time constraints contributed to its offering of Lee's Declaration.

For purposes of the current Motion only, the Court

accepts JSL's explanation of the circumstances that led to submission of the Lee Declaration and finds on this record that JSL's counsel did not act in bad faith.  The Court, however, finds the Lee and Yoon Declarations are not entitled to much weight when considered in light of the deposition testimony of Lee and Yoon.

Finally, Plaintiffs request an award of costs and attorneys' fees incurred to respond to what Plaintiffs characterizes as a meritless Motion to Vacate based on perjured testimony by Lee and Yoon.  As noted, the Court declines to find JSL's counsel acted in bad faith when submitting the Lee and Yoon Declarations.  Thus, the Court denies Plaintiffs' request for attorneys' fees and costs on this basis with leave to renew their requests in the future if there is a basis to do so.

**B.   Alter-Ego Liability.**

As noted, Plaintiffs contend they have proffered sufficient evidence that JSL is the alter ego of GMT and that JSL's vessel, the Venus, should continue to be held as security for the debt allegedly owed by GMT to OSS.  Specifically, Plaintiffs contend GMT totally dominated and controlled the operations of JSL to the point that JSL did not have any separate interests of its own. In addition, Plaintiffs contend JSL's corporate form was used by GMT to perpetuate a fraud by attempting to make GMT "judgment proof."

22 - OPINION AND ORDER

The sole issue before the Court at this stage of the proceedings is whether Plaintiffs have met their burden to show there is probable cause (that is, a reasonable likelihood) that they ultimately will prove their alter-ego claim against JSL on the merits.  As noted, the Court does not make binding factual findings on the merits of the alter-ego claim.

    **1.   Dominion and Control.**

After carefully considering the evidence submitted by the parties and the arguments submitted in briefing and at the hearings, the Court concludes Plaintiffs have shown there is probable cause to believe Plaintiffs can prove the following facts with respect to the domination and control prong of the alter-ego test set out in *Chan*:

a.   Hong incorporated GMT in Singapore in November 2001 and JSL on May 7, 2008, in Panama.

b.   Until about November 2010 when Hong became the sole shareholder in GMT, only Hong's wife, Yoon, held a nominal stake (0.2%).  GMT added Yoon to satisfy the formalities of Singapore corporate law, which apparently required two Singapore nationals or citizens in order to incorporate there. Yoon admitted in her deposition that she was a director, officer, and shareholder for GMT in name only and did not perform any work for GMT.

c.   Hong began as the President and Managing

Director of JSL and named only Yoon and his son, Won, as officers
and directors.  Neither Yoon nor Won had any experience with
shipping at the time, and Won was then a high-school student.
Hong, Yoon, and Won each held a third of the shares in JSL.
Under the articles of incorporation for JSL, Hong had full powers
to conduct the business of JSL without regard to the Board of
Directors or shareholders.

d.   JSL's Panamanian incorporation required it to
be capitalized with $10,000, but it was not.  JSL also did not
issue stock; did not maintain a stock registry; did not hire
employees; and did not maintain a telephone listing, a website,
or an email address.

e.   JSL did not do any business from the time of
its incorporation in 2008 to March 2010 when it purchased the GMT
Venus.  JSL time-chartered the Venus to GMT In June 2010.  The
Venus is JSL's sole asset, and JSL does not conduct any other
business.

f.   JSL has one bank account opened by Hong at
Hana Bank in Singapore.  Hong was the sole and exclusive
signatory until he resigned from JSL in approximately December
2010.  GMT has a separate bank account at Hana Bank as well, and
Hong is the sole and exclusive signatory.

g.   JSL has not held regular meetings of the
Board of Directors.  Yoon stated two Board meetings were held at

24 - OPINION AND ORDER

the offices of GMT.  Despite Yoon's official role as secretary,
Hong prepared at least some of the minutes from the meetings.
Hong also prepared minutes for a JSL meeting in 2011 after he had
resigned from JSL.  Neither Hong nor Yoon could recall their son
Won attending those meetings despite the fact that Won's
signature appears on the Board minutes as "present at the meeting
in person."  Yoon attested she traveled to visit her son at least
once while he was in the Korean Army to have him sign the minutes
after the meeting had taken place.  It does not appear Won
performed any work in his role as Treasurer.

          h.   In approximately November 2010 after the
dispute arose with OSS, Yoon resigned her position as a director
of GMT and relinquished her nominal shareholding.  In
approximately December 2010, Hong resigned as President and
Managing Director of JSL and turned over his roles to Yoon and
his shares to Won.  In March 2011 Hong's mother, Lee, was
appointed as a director of JSL.

          i.   Since Hong's resignation from JSL, Yoon
testified she consults Hong on some decisions because she cannot
make decisions on behalf of JSL based on her own experience in
the shipping industry.

          j.   GMT exercised complete control over JSL
during the relevant period and appears to use JSL's sole asset,
the Venus, as GMT's own.  Hong admitted at deposition that he was

25 - OPINION AND ORDER

in total control of both JSL and GMT when he signed the
time-charter agreement between GMT and JSL, which is exemplified
in part by the addendum to the time-charter agreement with Glovis
that Hong signed for both GMT and JSL (but with different forms
of his name).  Furthermore, communications from Doriko, manager
of the Venus, were emailed to GMT rather than to JSL, and many of
those communications refer to GMT as the "owner" of the vessel.
Indeed, the Venus bears the letters "GMT" on its hull.  JSL,
however, points out the fact that corporations have common owners
and directors does not mean one of those entities has *per se*
control over the other.  JSL also notes the reference to GMT as
"owner" and the appearance of GMT in the vessel's name are not
uncommon practices for long-term time charterers.  Although the
Court agrees such facts alone would not be sufficient to sustain
Plaintiffs' burden, these facts are relevant to the Court's
consideration of the totality of the circumstances.

      k.  When GMT assigned to JSL the payments due
under the Glovis time-charter agreement ($8,500 per day), that
sum exceeded by $550 per day the amount due to JSL under the
time-charter agreement with GMT ($7,950).  In effect, GMT created
a no-interest loan to JSL of $550 per day totaling in excess of
$200,000 per year.  JSL did not produce any documents that
accounted for or indicated an intent to repay this amount.

      l.  Yoon and Lee did not gather any documents on

behalf of JSL in response to production requests made by
Plaintiffs, and Hong admitted all important JSL documents were
kept at his home.

    m. GMT, through Yang (GMT Korea) and Hong (GMT
Singapore), was involved in providing the Declarations of Lee and
Yoon on behalf of JSL, and a GMT representative insisted on
attending the depositions of JSL directors Lee and Yoon.

  The Court concludes this record is sufficient to support a
probable cause finding that JSL is the alter ego of GMT because
GMT totally dominated and controlled JSL during the relevant
period to such an extent that JSL did not have a separate
identity or separate interests of its own.

    **2. Fraud.**

    Even if Plaintiffs could not establish GMT totally
dominated and controlled JSL, Plaintiffs contend JSL's corporate
form has been fraudulently used by GMT to avoid obligations
allegedly owed by GMT to OSS.  In particular, Plaintiffs note it
can meet its burden by showing either fraud in the incorporation
of JSL or fraud in the use of its corporate form.  *See Bd. Of
Trustees of Mill Cabinet Pension Trust Fund for N. Cal. v. Valley
Cabinet and Mfg. Co.*, 877 F.2d 769, 774 (9th Cir. 1989).

  The Court finds Plaintiffs have demonstrated they are
reasonably likely to prove the following in support of their
alter-ego claim based on fraud:

        a.    Yoon was appointed as an officer,
shareholder, and director of GMT only to meet the formal
requirement of Singapore corporate law.  Yoon admitted she never
performed any work for GMT.

        b.    Although JSL was supposed to be capitalized
initially with the minimal sum of $10,000, it was not and it did
not issue stock.  Yoon testified the amount of stock disclosed in
the incorporation of JSL in Panama did not matter, and they were
able to "just make up" the initial stock distribution to satisfy
the formal requirements under Panamanian corporate law.

        c.    Yoon and her son, Won, were included merely to
create the appearance that corporate formalities were being
observed.  Neither had shipping experience nor fulfilled much, if
any, functional role in JSL before the dispute with Plaintiffs
arose.

        d.    The timing of the actions of GMT and JSL
after the dispute arose with Plaintiffs in late August 2010
suggests GMT sought to create distance between itself and JSL
despite retaining functional control of both entities with Hong's
family members in proxy positions with JSL:  In approximately
November 2010, Yoon resigned from GMT; in November 2010 GMT also
assigned its right to payment under the Glovis time-charter
agreement to JSL; and in approximately December 2010, Hong
resigned from JSL and Yoon took over as President and Managing

Director.  Yoon admitted she still seeks Hong's advice on JSL
business, and her testimony reflects she has only a slight
familiarity with the operations of the company.  Furthermore,
Lee's deposition reflects her appointment as a director of JSL in
March 2011 was not based on any specific shipping knowledge or
expertise.

            e.   The actions of JSL and GMT in producing Lee's
Declaration and the documents responsive to Plaintiffs'
production requests suggest (1) Hong and GMT were in control of
the information provided about JSL rather than Yoon and Lee as
acting directors and (2) Hong and GMT were working to create the
impression that GMT and JSL were separate entities.  For example,
GMT Korea director Yang worked with JSL's representatives to
determine whether Lee should offer a declaration, and Hong
delivered to Yoon the declaration that she ultimately signed in
support of JSL's Motion.  Both Declarations appear to state facts
beyond the personal knowledge of Lee and Yoon.

            f.   GMT has commingled its assets with JSL by
assigning to JSL funds due to GMT in excess of the amount that
GMT owed to JSL under their time-charter agreement.  GMT did this
despite Hong's testimony that GMT has debts and does not have any
money.

            g.   Hong executed the November 2010 addendum to
the Glovis time-charter agreement on behalf of GMT and JSL and

29 - OPINION AND ORDER

signed as "Hong Jae Hyung," President of JSL, and as "Jay H. Hong," Managing Director of GMT.

       h.   Hong has incorporated other companies such as Link Ocean Shipping SA (owner of the GMT Polaris) and LS Maritime SA in Panama for which he served as President and Managing Director.  Yoon admitted she assumed the same roles as shareholder and director in Link Ocean Shipping as she did in GMT and did not perform any functional role in the management of that company.  With respect to LS Maritime, Yoon could not recall whether she was a director, officer, or shareholder.  In November 2010 under the direction of Hong, GMT transferred its time-charter for the vessel M/V SB Queen to LS Maritime SA.

      The Court concludes this record is also sufficient to support a probable cause finding that JSL is the alter ego of GMT because JSL was fraudulently incorporated and its corporate form has been fraudulently used to avoid GMT's obligations.

      In summary, the Court concludes Plaintiffs have met their probable-cause burden to show it is reasonably likely they will prevail on their alter-ego claim under either or both prongs of the federal common-law test for alter-ego liability as set out in *Chan*.

**CONCLUSION**

      For these reasons, the Court **DENIES** JSL's Motion (#21) to

30 - OPINION AND ORDER

Vacate Maritime Attachment and **DENIES** Plaintiffs' request for costs and attorneys' fees incurred to respond to JSL's Motion. The Court also **GRANTS in part** and **DENIES in part** Plaintiffs' Motion to Strike as set out herein.

The Court **directs** the parties to confer as to a case-management plan for the Court to adopt for this case pursuant to Federal Rule of Civil Procedure 16 and to file **no later than May 20, 2011,** a Joint Case-Management Proposal.

IT IS SO ORDERED.

DATED this 6th day of May 2011.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

31 - OPINION AND ORDER